504

Commonwealth of Pennsylvania, Pennsylvania Department of Transportation et al., Appellants *v.* Helen L. Phillips, Administrator of the Estate of Vaughn E. Phillips, Deceased, Appellees.

Commonwealth of Pennsylvania, Pennsylvania Department of Transportation et al., Appellants *v.* Helen L. Phillips, Administrator of the Estate of Vaughn E. Phillips, Appellees.

Helen L. Phillips, Administrator of the Estate of Vaughn E. Phillips, Deceased, Appellants *v.* Commonwealth of Pennsylvania, Pennsylvania Department of Transportation et al., Appellees.

Argued September 10, 1984, before Judges WIL-
LIAMS, JR. and BARRY and Senior Judge BLATT, sitting
as a panel of three.

*Randall G. Gale,* Deputy Attorney General, with him, *Mark E. Garber, Jr.,* Acting Chief, Torts Litigation Unit, and *LeRoy S. Zimmerman,* Attorney General, for appellants/appellees, Commonwealth of Pennsylvania, Department of Transportation, and Lewis G. Kerstetter.

*Charles J. Weyandt, Dunaway, Weyandt, McCormick & Jones,* for appellants/appellees, Joel Confer, AMC, Inc., and Joel Confer Toyota, Inc.

*H. Amos Goodall, Jr., Miller, Kistler & Campbell, Inc.,* for appellants/appellees, Carl E. McCartney et al.

*James H. Thomas,* with him, *Susan E. Grosh, Wenger, Byler & Thomas,* for appellants/appellees, David, Leah, and Abram Ebersol.

*David A. Flood,* for appellant/appellee, Logan Fire Co., No. 1.

*Wayne F. Shade,* with him, *Merritt E. McKnight,* for appellee/appellant, Helen L. Phillips.

*James M. Horn, McQuaide, Blasko, Schwartz, Fleming & Faulkner, Inc.,* for appellee, Protective Services, Inc.

Opinion by Judge Barry, February 11, 1985:

These cross-appeals follow an order of the Court of Common Pleas of Centre County, dismissing exceptions filed by plaintiff Helen L. Phillips, Administratrix of the Estate of Vaughn Phillips, and various defendants. These exceptions were filed to a trial court order which entered judgment for Mrs. Phillips against defendant, Department of Transportation (DOT), in the amount of $319,419.92, defendant, Lewis G. Kerstetter, DOT Assistant County Superintendent, in the amount of $39,927.49 and defendant, Logan Fire Company No. 1 (Logan), in the amount of $39,927.49.

The facts, although somewhat complicated, are largely undisputed. Mrs. Phillips instituted a wrongful death and survival action on behalf of herself and four children against the above named original defendants for damages suffered as a result of the death of her husband in a two car accident on January 11, 1978. At about 9:30 p.m., a vehicle driven by Mr. Carl McCartney collided with a vehicle driven by Mr. Phillips on Pennsylvania Route 26, a two-lane highway. Mr. McCartney's car struck a large patch of ice just

before impact, lost control, spun and hit Mr. Phillips' vehicle, killing him instantly. The collision occurred adjacent to the driveway of a farm occupied by, defendant, Abram Ebersol and owned by his parents, defendants David and Leah Ebersol.

The trial court found that various factors caused the development of the ice patch on Route 26. Natural water had run off land near the highway and settled on Route 26; heavy rain had fallen in the area on January 7 and 9, 1978. The Ebersol house had been flooded and, prior to the accident, the water from the house had been pumped onto an adjoining field, which, in turn, emptied into a drainage ditch and eventually ran onto Route 26.

When he was unable to empty all the water from his basement, Abram Ebersol sought assistance from Logan. On the afternoon of January 9, 1978, Logan pumped the water which emptied into the drainage ditch parallel to Route 26 and eventually ran underneath the highway.[1] Because of obstructions in the ditch, the amount of water intake was limited. Some of the water overflowed and ran onto the road before reaching a culvert in the ditch in front of the Ebersol house and some water followed the ditch to the culvert but flowed around it because of obstructions in the culvert. This water continued to flow along the road until it spilled onto Route 26 at a point where the highway intersected the Ebersol driveway.

Upon Logan's arrival, the ice patch extended six to eight feet across the road, was twelve to fifteen feet long and eight inches thick. When Logan completed the pumping, the size of the ice patch had increased to about fifty feet in length and eighteen inches in height.

---

[1] The trial court computed that 26 to 32 inches of water was pumped by Logan from the Ebersol basement or a total discharge of 15,429 or 18,990 gallons of water.

In fact, as the Logan truck departed, the testimony was that it drove over the ice that had already accumulated on Route 26. It was found, moreover, that, when Logan began pumping, the temperature was near the freezing point, dropped below freezing shortly thereafter, and remained below freezing until and when the collision between the two vehicles occurred.

On January 10, 1978, at approximately 6:40 p.m., nearly twenty-seven hours before the collision, a vehicle driven by Glenn W. Thompson, Jr., lost control on the ice patch and veered from the highway into an adjacent field. That evening DOT was notified of the ice condition and then dispatched a crew which placed a trestle and light directly adjacent to the ice condition at the berm of the road. DOT employees attempted unsuccessfully to activate the light and then departed, leaving the trestle with a light that did not function.

The trestles were owned and provided by defendant, Protective Services, Inc. (Protective Services), under a lease with DOT. Upon notice from DOT, Protective Services placed and maintained the trestles only at the time and for the place requested by DOT. Any trestle found by employees of Protective Services on DOT property was to be retrieved by them. The trial court found that the trestle used in this case was taken either from a DOT office in Bellefonte, Pa., or the supply shed in Snow Shoe, Pa. In any event, DOT employees both placed and removed the trestle, and DOT never advised Protective Services that this trestle and light were in use. Protective Services did not receive payment for the use of the trestle and light.

On the morning of January 11, 1978, Assistant County Superintendent Kerstetter observed the ice patch while on regular snow and ice patrol duty but did not correct the condition. In addition to placing the trestle and defective light, DOT applied salt and cinders to the ice patch.

The trial court determined that D.OT was 80% negligent, Mr. Kerstetter was 10% negligent and Logan was 10% negligent. The trial court found that DOT had the duty to maintain Route 26 in a reasonably safe condition and, because it breached this duty, its conduct was an immediate and substantial factor which brought about the accident and, it, therefore, was liable to Mrs. Phillips.

The trial court found Mr. Kerstetter negligent for his failure to observe the dangerous icy condition where Route 26 joins the Ebersol driveway, to adequately warn motorists about the dangerous condition, to remove the ice and to close Route 26 when unable to correct the condition.[2]

The trial court also concluded that Logan was negligent since it knew the ice patch existed before it began and after it completed pumping Ebersol's basement because Logan's truck drove over the ice when it arrived and departed. Logan, furthermore, knew or should have known that pumping the water while the temperature fell rapidly would substantially increase the size of the existing hazardous condition.

The trial court, in addition, concluded that the decedent, Vaughn Phillips, and defendants-appellants Carl McCartney, Joel Confer, A.M.C., Inc., Joel Confer, Toyota, Inc., David Z. and Leah K. Ebersol, Abram B. Ebersol, as well as additional defendants-appellees, Protective Services, Inc. and Walker Township Fire Company (Walker)[3] were not negligent.

---

[2] Defendants, David Bobanik, Assistant District Engineer, Gene Zazworsky, District Maintenance Engineer, Arthur H. Reede, Jr., DOT County Superintendent, Robert Monsell, Logan President and Earl Schultz, Logan Fire Chief, named in the original action were held to be individuals in the "chain of command" and not subject to suit on any theory of vicarious liability.

[3] DOT joined Walker as an additional defendant in the suit. The claim against Walker was non-suited by the trial court.

Exceptions were filed by DOT, Mr. Kerstetter and Logan as to liability and by Mrs. Phillips as to damages. All exceptions were dismissed by the trial court and the excepting parties cross-appealed.

We approve the scope of review of findings of a trial judge in a non-jury case which the Pennsylvania Superior Court has adopted, that is, the findings must be accorded the same weight and effect on appeal as a jury verdict, and will not be reversed absent an abuse of discretion or lack of evidentiary support. *Brenna v. Nationwide Ins. Co.*, 294 Pa. Superior Ct. 564, 440 A.2d 609 (1982).

### LIABILITY

DOT advances numerous arguments addressed here sequentially.

It asserts first of all that the trial court should have held Abram Ebersol liable because he had pumped water on the highway forming ice. The findings and evidence indicate, however, that the ice patch had been caused by natural water runoff, by water pumped from the Ebersol basement by *Logan,* which overflowed a deep drainage ditch parallel to the highway because of obstructions in it, and, by the abrupt drop in temperature below freezing during and after Logan pumped the water. The trial absolved Abram Ebersol of liability because there was no evidence which proved that he had contributed to the creation of the dangerous ice patch.

DOT argues that, regardless of whether water had been pumped from the basement, Ebersol's driveway, an artificial structure, blocked the culvert along the highway into which runoff water should have flowed, and diverted it onto the highway. DOT urges that Abram Ebersol knew about the ice condition and had admitted that *some* water was diverted by his driveway onto Route 26. DOT contends, therefore, that

Abram Ebersol was negligent because of the condition created by his land and because he failed to warn of the condition or correct it. In support of these arguments, DOT cites Sections 350[4] and 368[5] of the Restatement Torts (Second) (1965) as well as *Piekarski v. Club Overlook Estates, Inc.*, 281 Pa. Superior Ct. 162, 421 A.2d 1198 (1980). Whether, however, the ice patch constituted an artificial condition under Sections 350 or 368 of the Restatement Torts (Second) (1965) or *Piekarski* is of no moment since the trial court concluded that DOT was liable and that Abram Ebersol was not guilty of negligence.

It has been held, that the Commonwealth has exclusive responsibility for the repair and maintenance of state roads. *Stevens v. Reading Street Railway Co.*, 384 Pa. 390, 121 A.2d 128 (1956); *Shollar v. Department of Transportation*, 70 Pa. Commonwealth Ct. 243, 453 A.2d 24 (1982). DOT had the duty to warn and correct the dangerous ice condition and because of its failure to do so, after actual knowledge of the

[4] Section 350 of the Restatement Torts (Second) (1965) states: A possessor of land over which there is a public highway is subject to liability for physical harm caused to travelers thereon by failure to exercise reasonable care in creating or maintaining in reasonably safe condition any structure or other artificial condition created or maintained in the highway by him or for his sole benefit subsequent to its dedication.

[5] Section 368 of the Restatement Torts (Second) (1965) states: A possessor of land who creates or permits to remain thereon an excavation or other artificial condition so near an existing highway that he realizes or should realize that involves an unreasonable risk to others accidentally brought into contact with such condition while traveling with reasonable care upon the highway is subject to liability for physical harm thereby caused to persons who

(a) are traveling on the highway, or

(b) foreseeably deviate from it in the ordinary course of travel.

condition on the day before the accident, DOT was not improperly found liable by the trial court.[6]

DOT further alleges that Abram Ebersol is liable for Logan's negligence because he ordered and supervised Logan's pumping operation and, therefore, knew about the dangerous condition as well as Logan's negligence. In support of this position, DOT cites Section 414A[7] of the Restatement Torts (Second) (1965). In this connection we accept the conclusion of the trial judge that "Defendant, Abram B. Ebersol was not guilty of any negligent condition that was a substantial factor in bringing about the accident." (Trial Court Opinion, p. 20.)

DOT next asserts that the trial court erred because it erroneously applied the "sudden emergency" doctrine rather than the "assured clear distance ahead" doctrine when it held that Mr. McCartney was not liable.[8]

---

[6] Logan advanced these arguments as well, most notably that Abram Ebersol was liable under the above mentioned Restatements of Torts. Since we have already treated this argument espoused by DOT, it is unnecessary to reiterate our conclusion. DOT also argued that Abram Ebersol and Logan were negligent per se under Section 421 of the State Highway Law, Act of June 1, 1945, P.L. 1242, 36 P.S. §670-421 which prohibits the discharge of drainage onto a state highway and negligent for violation of Section 3709 of the Vehicle Code (Code), 75 Pa. C. S. §3709 which pertains to the depositing of waste and other material on a highway. We accept the conclusion of the trial judge exonerating Abram Ebersol.

[7] Section 414A of the Restatement Torts (Second) (1965) provides:

A possessor of land who has employed or permitted an independent contractor to do work on the land, and knows or has reason to know that the activities of the contractor or conditions created by him involve an unreasonable risk of physical harm to those outside of the land, is subject to liability to them for such harm if he fails to exercise reasonable care to protect them against it.

[8] This argument was also made by Logan. It is further argued by appellants that Mr. McCarthy also violated Sections 3302, 3306

The trial court's only reference to either doctrine is in a passing reference to a sudden emergency confronted by Mr. McCartney. (N.T. p. 756-L.) DOT's claim, in its exception, that if the trial judge had applied the "assured clear distance ahead" test, then Mr. McCartney would not have been exonerated is not borne out by the testimony. The range of a driver's vision may vary according to the attendant circumstances. *Stark v. Fullerton Trucking Co.*, 318 Pa. 541, 179 A. 84 (1935). These include, for instance, time of day, road conditions, or weather. We are convinced that the "assured clear distance ahead" rule was found by the trial court to have no relevance to the facts in this case. In the context of a non-jury decision, where the niceties of a charge on one nebulous theory rather than another are not involved, we find no error.

DOT next contends that the trial court improperly considered remedial measures taken by DOT after the accident had occurred. The trial court admitted photographs which portrayed the conditions on Route 26 less than twelve hours after the fatal collision. The photographs also showed DOT employees and equipment removing the ice patch. DOT alleges that the admission of this evidence was irrelevant and prejudicial and should not be construed as an admission against it. DOT's arguments are incorrect. The photographer testified that he took the photographs on January 12, 1978 at about 9 a.m. and that they fully and accurately represented the scene as it existed when he photographed it. (N.T. pp. 55-L-57-L.) Two witnesses, Mr. Glenn Thompson, Jr. and Trooper Joseph Piccolo, Jr., also testified that the photographs accurately represented the scene of the accident. The photographs, therefore, were properly identified, au-

---

and 3361 of the Code, however, it is our view that this contention is groundless based on the ensuing discussion.

thenticated and admitted. The incidental depiction of ice removal did not vitiate the ruling of the trial judge after he had seen the photographs in a non-jury context, therefore, we fail to see how DOT can claim error in this regard. *See Med-Mar, Inc. v. Dilworth,* 214 Pa. Superior Ct. 402, 257 A.2d 910 (1969) and *Nyce v. Muffley,* 384 Pa. 107, 119 A.2d 530 (1956).

DOT further contends that the trial court erroneously refused to admit evidence of custom which demonstrated a parol modification of its contract with Protective Services for supplying trestles and lights. DOT alleges that the delivery of trestles to DOT's maintenance shed constituted a change in the course of conduct or manner of performance under the contract thereby providing a link between Protective Services and negligent conduct by this company. DOT concludes, therefore, that Protective Services had the duty to maintain and repair the trestles, in particular, the trestle and light placed adjacent to the dangerous ice condition.

The evidence indicates to the contrary that Protective Services, upon request by DOT and in accordance with the contract, placed and maintained barriers where and when DOT indicated. Protective Services *did not* leave the barriers on DOT premises for its use but rather delivered them only when specifically requested by DOT. Protective Services' employees, in fact, were instructed to retrieve barriers discovered on DOT (Commonwealth) property. The trestle in question was obtained from DOT premises by DOT employees and placed and subsequently removed by them. Protective Services was never notified about the use of its trestle and light nor was it apparently paid for its use. Protective Services had no control over the actions of the DOT employees; therefore, it was not error for the trial court to relieve Protective Services of liability based on the finding of the negli-

gence of DOT employees. There was, moreover, no custom or practice established which modified the terms of the contract since, as the evidence indicates, barriers were not left on DOT property, were retrieved by Protective Services if discovered on DOT property and were delivered and placed only when requested by DOT.

DOT also posits the view that the admission of evidence regarding the accident, which involved Glen Thompson, Jr., prior to the fatal collision was error. The trial court permitted "testimony as to an accident that happened allegedly on the preceding day, but [would] not permit any testimony as to how that accident happened, other than what the condition of the roadway was." (N.T., p. 78-L.) In its opinion, the trial court stated that this evidence was proper because it "established actual knowledge to the Commonwealth of the existence of the condition and the degree of danger of the condition by reason of Thompson's report to the State Police, who in turn, notified Penn Dot." (Trial Court Opinion, p. 11.) DOT asserts that although the trial court refused admission of testimony regarding how the accident happened, it still detailed the Thompson accident in its opinion. Because of this inconsistency, it is DOT's contention that the trial court assumed that the two accidents were the same. For a number of reasons, we disagree.

In *Liggett's Petition*, 291 Pa. 109, 139 A. 619 (1927), the Pennsylvania Supreme Court held that considerable liberality is accorded a judge sitting non-jury in ruling on questions of evidence unless the admission of objectionable evidence *solely* supports the material findings. We believe the trial court had the discretion to admit this evidence and did so only to demonstrate that DOT had actual knowledge of the dangerous ice patch. Such evidence may be admitted for a purpose other than to prove prior negligence.

*Hyndman v. Pennsylvania Railroad Company,* 396 Pa. 190, 152 A.2d 251 (1959). Evidence of a prior similar accident is admissible to show the conditions surrounding the accident and acts as notice to those responsible for the condition and the likelihood of injury. In *Colangelo v. Penn Hills Center, Inc.,* 221 Pa. Superior Ct. 381, 292 A.2d 490 (1972), it was held that evidence of similar accidents was a proper and significant means of proving both knowledge and existence of dangerous conditions to establish a prima facie case. Clearly, the trial court considered the evidence only to determine the condition of Route 26 in the vicinity of the fatal accident and to impute actual knowledge to DOT of the existence of the dangerous condition.

DOT, finally, advances numerous additional evidentiary errors which, it contends, require that a new trial be granted.[9] Each of these alleged errors have been evaluated and reviewed in conjunction with the

---

[9] DOT alleged the following errors:

a. The trial court erred when it sustained plaintiff's objection to a question of Abram Ebersol regarding the amount of precipitation during the winter of 1978.

b. The trial court erred because it refused to allow a witness to testify on cross-examination as to where the accident occurred when this topic had been broached on direct examination.

c. The trial court erred when it sustained plaintiff's objection when State Trooper Piccolo was questioned about illumination of trestle lights or flashers by automobile head lights.

d. The trial court erred when it sustained plaintiff's objection to the testimony of a witness concerning exhibit #10 which had been admitted into evidence and depicted a fair and accurate presentation of the scene of the accident.

e. The trial court erred when it overruled DOT's objection to a witness questioned on cross-examination regarding the closing of roads when direct was limited to weather and road conditions.

record. The record reveals that DOT's contentions are without merit. The errors alleged by DOT are, at best, harmless. The record independently substantiates the trial court holding regarding DOT's negligence and that DOT was not prejudiced by any evidentiary rulings.

Logan argues that Mrs. Phillips had the burden of proving directly or by reasonable inference that its negligence was the proximate cause of the accident, *Cuthbert v. City of Philadelphia*, 417 Pa. 610, 209 A.2d 261 (1975), but she failed to fulfill this burden.

It is Logan's position that the evidence indicates that the temperature was mild during the pumping operation, and when it finished, no increase in the size of the ice patch or in the flow of water upon the highway was observed. No evidence, it argues, demonstrates that it negligently or improperly performed the pumping operations; rather, the record indicates that adequate precautionary measures were taken as the water was pumped and discharged. Logan, therefore, maintains that it could not have foreseen the sudden drop in temperature or the significant increase in the size of the ice patch after the pumping operations. Any pumping done by Abram Ebersol and Walker, Logan argues, combined with the natural runoff, would have contributed to the ice patch. It is Logan's contention, therefore, that there is no evidence to conclude by inference or otherwise that Logan could have reasonably anticipated or foreseen the likelihood of harm to Mr. Phillips as a consequence of the pumping operation.

---

f. The trial court erred when it struck testimony of a DOT employee regarding the lack of trestle units at its maintenance shed.

g. The trial court erred when it reserved its ruling on whether the defendant's, Mr. McCarney's, deposition was admissible for purposes other than impeachment.

We disagree with Logan's characterization of the issue as one of foreseeability as well as its conclusion that it could not be liable under the circumstances of the case.

Foreseeability is not an element used to determine whether negligent conduct was the proximate or legal cause of an accident but it is an element considered when determining the existence of negligent conduct. *Brown v. Tinneny*, 280 Pa. Superior Ct. 512, 421 A.2d 839 (1980). Negligent conduct, that is, an absence of ordinary care which a reasonable person would exercise under particular circumstances, results where a wrongdoer could have anticipated or foreseen the likelihood of harm to a person injured as a result of the wrongdoer's act. *Zilka v. Sanctis Construction, Inc.*, 409 Pa. 396, 186 A.2d 897 (1962). To determine whether the wrongdoer proximately or legally caused the injury giving rise to the negligence action, there must be a finding that the wrongdoer's allegedly wrongful conduct was a *sustantial factor* in bringing about the accident, even though it need not be the only factor. *Majors v. Brodhead Hotel*, 416 Pa. 265, 205 A.2d 873 (1965). The fact that conduct might not reasonably be foreseen to result in a particular harm or cause harm in a particular manner that in fact occurred does not preclude liability. *Fredericks v. Castora*, 241 Pa. Superior Ct. 211, 360 A.2d 696 (1976). We agree with the trial court's conclusion that Mrs. Phillips indeed proved that Logan knew about the dangerous condition and could have reasonably foreseen the harmful consequences of its negligent conduct. In addition, the trial court properly absolved Abram Ebersol of responsibility because his conduct was not a substantial factor in bringing about the accident. The evidence supports the trial court's action in this regard.

Logan next contends that the trial court erred when it granted Walker's motion for non-suit. Non-suit, it argues, should not be granted to one of several defendants at the close of plaintiff's case until each defendant has had the opportunity to present evidence on the issue of liability of the other defendants. Logan urges that *Mazza v. Mattiace*, 284 Pa. Superior Ct. 273, 425 A.2d 809 (1981), is dispositive because it held that, in multi-defendant litigation, evidence introduced by one defendant may inculpate another as if the evidence were introduced as part of the plaintiff's case; otherwise, if a non-suit is granted, then the case may not be disposed of on its merits. Logan, moreover, asserts that if the evidence is insufficient to hold a defendant liable, that defendant at the conclusion of the case can move for and be granted a directed verdict. Logan concludes, therefore, that a question of fact regarding whether Walker's action contributed to the resulting accident was unresolved.

We must disagree with this assertion. Logan, and the other defendants below, failed to object to Walker's motion for compulsory non-suit at trial (N.T., pp. 421-L-423-L) and, therefore, waived this issue.

## DAMAGES

Appellee, Mrs. Phillips, cross appeals the order of the trial court and contends, essentially, that the award of damages is inadequate. The trial court found DOT, Mr. Kerstetter and Logan liable for damages as follows: Wrongful Death Action—$142,560 less $6,500 for No-Fault right of recovery or a net total of $136,060; Survival Action—$211,600 less $15,000 for No-Fault right of recovery or a net total of $196,600. The total net decision was $332,660. The trial court also assessed damages for delay under Rule 238 of the Pennsylvania Rules of Civil Procedure at

10% per annum or $66,614.90, for a total of $399,-274.90.[10]

Mrs. Phillips argues that the federal pay scale admitted into evidence (Exhibit 27), dated October 5,

[10] The trial court noted that survival actions compensate the decedent's estate for various categories of damage sustained by the decedent whereas wrongful death actions deal with the economic impact of the death on the designated beneficiaries. It further stated that, unlike a wrongful death action, a survival action is not a new cause of action but rather continues the right of action, which accrued to the decedent, in the personal representative.

The trial court awarded damages to Mrs. Phillips in accordance with the Wrongful Death Act as follows:

1. Funeral, burial and estate administration expenses incurred.

2. An amount that fairly and adequately compensates Mrs. Phillips and her four children for their loss of such contributions as they would have received between the time of the death of the decedent and October 16, 1981, the date of our verdict. This includes all monies that the decedent would have spent for or given to his family for such items as shelter, food, clothing, medical care, education, entertainment, gifts and recreation.

3. The value of all sums that the decedent would have contributed to the support of his family between October 16, 1981 and the end of his life expectancy.

4. In addition to the monetary contributions that the decedent would have contributed to his family's support, the estate is entitled to be awarded a sum which fairly and adequately compensates the Phillips family for the pecuniary value of the services, society and comfort that Mr. Phillips would have given to his family had he lived, including such elements as work around the home; provision of physical comforts and services; provision of society and comfort.

5. An amount which fairly compensates for the loss of the services that the decedent as a father would have contributed to his children. We should consider the monetary value of such services as guidance, tutelage and moral upbringing which the children would have received, up to such time as such services would have been provided, had the death not occurred.

1980, should have been considered by the trial court for computation of lost future earnings. Under this pay scale, her husband would have received by virtue of satisfactory performance, within grade increases

---

The trial court awarded damages under the Survival Act as follows:

1. Since all of the evidence points to the fact that decedent was killed instantly, he could not have earned money between the accident and his death.

2. An award of the total net amount that the decedent would have earned between the date of his death and October 18, 1983. Net earnings are determined by first calculating the total amount of the decedent's gross earnings between the date of death and October 16, 1981; from this amount must be deducted the amount of monetary contributions he would have made to his family during this period and the amount of money that the decedent would have spent on himself for his personal maintenance during this period. The probable cost of personal maintenance includes only the necessary and economical living expenses, such as food, shelter and clothing, that the decedent would have been required to spend in order to maintain life during this period.

3. An award of the value of the net amount that the decedent would have earned between October 16, 1981 and the end of his life expectancy net earnings for this period are determined by calculating the total amount of the decedent's gross earnings between October 16, 1981 and the end of his life expectancy; and, from the amount there must be deducted the probable cost of his necessary and economical living expenses required to sustain life during this period together with the amount of monetary contributions he would have made to his family during this period. This award to the estate for total lost future net earnings thus represents the total net earnings over the decedent's work-life expectancy.

4. An amount that will fairly and adequately compensate for the mental and physical pain, suffering and inconvenience that the decedent endured from the moment of his injury to the moment of his death as a result of this accident. These damages include fright and mental suffering attributed to the peril leading to decedent's death.

*built into* the pay scale which are tantamount to productivity increases. She asserts that these productivity increases do not reflect future pay scale revisions precipitated by annual inflation. She maintains, however, that inflationary revisions in the federal pay scale should be considered through the date of trial but that future loss of earnings should be computed in accordance with the pay scale in effect at the trial date without regard to yearly cost of living increases which compensate for inflation. This formula, Mrs. Phillips contends, is in accordance with *Kaczkowski v. Bolubasz*, 491 Pa. 561, 421 A.2d 1027 (1980), where the Pennsylvania Supreme Court held that productivity factors (merit based increases) should be reflected in an award for loss of future earning capacity.

The trial court based its award of damages for lost earnings from the date of Mr. Phillips' death through the date of the trial on the reclassification of Centre County from a Grade 10 to a Grade 11 County and on the implementation of earned within grade increases (Exhibit 29). It based its award of lost future earnings on the calculations of a consulting actuary (Exhibit 30) which projected Mr. Phillips' loss of net earnings from October 5, 1980 through retirement at age 65 *including* scheduled within grade productivity increases. The trial court recognized that productivity factors are not speculative but are definable and predictable by economic experts, and are integral factors in computing lost future earnings. *Kaczkowski.*

Where the issue presented is the inadequacy of a verdict, the "injustice of the verdict should stand forth like a beacon." *Elza v. Chovan*, 396 Pa. 112, 118, 152 A.2d 238, 240 (1959). So long as the award bears a reasonable resemblance to the damages proved, or, unless the verdict is so inadequate that it suggests passion, prejudice, partiality, or corruption, we cannot substitute our judgment for that of the trial court.

*Dougherty v. Sadsbury Township,* 299 Pa. Superior Ct. 357, 445 A.2d 793 (1982). We are in no way shocked by the amount awarded to Mrs. Phillips and, therefore, believe that the trial court award was reasonable and adequate.

In our view, the trial court's award was in accordance with the objectives of *Kaczkowski,* namely the consideration of future productivity increases in an award for lost future earnings. Exhibit 27 likely contained inflationary increases which, under *Kaczkowski,* are considerations that may not be taken into account. Furthermore, no evidence was presented to show a separation of inflationary increases from productivity increases as required by *Kaczkowski.* Although admitted, the trial court, we believe, accorded little or no weight in this non-jury case to Exhibit 27.

Mrs. Phillips further asserts that the trial court erred when it determined that the expenses for Mr. Phillips' personal maintenance were understated. She argues that his personal maintenance expenses amounted to $5620.35 per year or 28.1% of his yearly earnings. She maintains that the trial court decision accepted 49% personal maintenance factor or $9771.58 of Mr. Phillips' yearly income. Mrs. Phillips had sought the admission of a personal maintenance study for 1977 by the United States Department of Labor in its Cost of Consumption tables which indicated that the average annual personal maintenance expenses for the intermediate income category was $4,500. The trial court refused to admit this evidence and, for this reason, Mrs. Phillips alleges error by the trial court.

The trial court reduced the award based on Mr. Phillips' personal maintenance expenses. The court recognized that personal maintenance expenses include "necessary and economical living expenses, such as food, shelter and clothing, that the decedent would have been required to spend in order to maintain life

during this period." (Trial Court Opinion, p. 24.) It determined that a deduction for personal maintenance was not limited to expenditures essential to the barest survival. Rather, the trial court concluded that deductions for leisure activities, for instance, must be made. *McClinton v. White,* 497 Pa. 610, 444 A.2d 85 (1982). It, therefore, adjusted the cost of Mr. Phillips' personal maintenance as claimed by Mrs. Phillips because it was understated; the court properly applied this adjustment to Exhibit 30 in computing lost future earnings. We, furthermore, agree that the trial court correctly refused the admission of the personal maintenance study since it was irrelevant because of its too general applicability.

Mrs. Phillips finally contends that the trial court did not make an award for her loss of companionship, comfort, society, guidance and solace *Spangler v. Helm's New York-Pittsburgh Motor Express,* 396 Pa. 482, 153 A.2d 490 (1959), as well as for pain and suffering.

The trial court determined that Mrs. Phillips was entitled to compensation for the "pecuniary value of the services, society and comfort that [Mr. Phillips] would have given to his family had he lived, including such elements as work around the home; provision of physical comforts and services; provision of society and comfort." (Trial Court Opinion, p. 23.) It, moreover, awarded damages "for the mental and physical pain, suffering and inconvenience that [Mr. Phillips] endured from the moment of his injury to the moment of his death as a result of this accident. These damages include fright and mental suffering attributed to the peril leading to [his] death. . . ." (Trial Court Opinion, p. 25.)

We believe the trial court adequately compensated Mrs. Phillips for the matters which *Spangler* addresses. It fully considered testimony and evidence

offered to demonstrate the tremendous qualities as a father and husband which Mr. Phillips displayed during his lifetime. We are of the opinion, therefore, that the award in this regard is reasonable and fair.

The trial court also awarded Mrs. Phillips for the pain and suffering endured by her husband. As a result of the accident, Mr. Phillips died instantly and, under these circumstances, the award was adequate and we will not disturb the trial court's decision.

We conclude, therefore, that the trial court committed no error or abuse of discretion with regard to its award of damages to Mrs. Phillips.

DOT contends that the trial court erred because it failed to allow income taxes as a cost of Mr. Phillips' personal maintenance. This question has already been resolved in *Gradel v. Inouye*, 491 Pa. 534, 421 A.2d 674 (1980), which held that income taxes are not a legitimate item of personal maintenance.

DOT further asserts that the trial court erred because it failed to apply the statutory limitations with regard to the assessment of delay damages and because it should have retroactively applied the limitations on damages pursuant to Section 8528 of the Judicial Code, (formerly Section 5111 of the Judicial Code, 42 Pa. C. S. §5111), 42 Pa. C. S. §8528. We have held that the Commonwealth is not immune from the assessment of delay damages. *Christy v. Darr*, 78 Pa. Commonwealth Ct. 354, 467 A.2d 1362 (1983). Moreover, we held in *Commonwealth v. Twentier*, 76 Pa. Commonwealth Ct. 537, 464 A.2d 642 (1983), that the provision which limits verdicts against the Commonwealth to $250,000 was not applicable to actions which accrued prior to the effective date of the provisions of the Judicial Code (that is, September 30, 1978 for Section 5111 and December 4, 1980 for Section 8528). This cause of action accrued on January 11, 1978, the

date of the fatal collision; therefore, these sections do not apply retroactively to this case.

DOT finally asserts in its cross-claim that it is entitled to indemnification from Logan as well as other defendants. DOT points to no valid theory which allows indemnification in its favor from the other defendants found liable in this case.

Affirmed.

### ORDER

Now, February 11, 1985, the order of the Court of Common Pleas of Centre County, entered October 21, 1983, at No. 1978-3270, is affirmed.

This decision was reached prior to the resignation of Judge WILLIAMS, JR.