J-A25011-14

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| JOSE BERDECIA-CORTES, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| DENIS P. ROGERS AND MAIN LINE | : | |
| SPINE SURGERY CENTER, INC., | : | |
| | : | |
| Appellees | : | No. 2689 EDA 2013 |

Appeal from the Judgment entered August 20, 2013,
Court of Common Pleas, Montgomery County,
Civil Division at No. 2008-09196

BEFORE:  DONOHUE, WECHT and PLATT*, JJ.

MEMORANDUM BY DONOHUE, J.:                **FILED OCTOBER 27, 2014**

Appellant, Jose Berdecia-Cortes ("Berdecia-Cortes"), appeals from the judgment entered on August 20, 2013 in the Court of Common Pleas of Montgomery County in favor of Appellees, Denis P. Rogers ("Dr. Rogers") and Main Line Spine Surgery Center, Inc. ("Main Line").  For the reasons that follow, we reverse and remand to the trial court for a new trial.

In May 2005, Berdecia-Cortes, while employed by Delaware Valley Lift Truck, Inc. ("Delaware Valley"), suffered a work-related injury to his spine, sciatic nerve and shoulders.  After returning to work in August of that year, he aggravated the prior injuries and/or suffered new ones.  On August 21, 2005, Dr. Rogers performed an independent medical examination of Berdecia-Cortes at the request of Nationwide Insurance Company, the workers' compensation carrier for Delaware Valley.  Dr. Rogers then referred

*Retired Senior Judge assigned to the Superior Court.

Berdecia-Cortes to Dr. Paul Marcotte, who after two office visits (and various tests) advised Berdecia-Cortes (and reported to Dr. Rogers) that a surgical fusion of multiple discs of the lumbar spine might be required as a last option after pursuing less aggressive alternatives. When Berdecia-Cortes met with Dr. Rogers again, Dr. Rogers offered Berdecia-Cortes another surgical option, a percutaneous disc compression using a Stryker DeKompressor device. Berdecia-Cortes agreed to this alternative procedure, and on May 4, 2006, Dr. Rogers performed the surgery.

Meanwhile, Berdecia-Cortes was involved in workers' compensation disputes with Delaware Valley, which challenged, *inter alia*, Delaware Valley's obligation to pay for portions of the care provided by Dr. Rogers, including the percutaneous decompression surgery. In a utilization review determination dated June 27, 2006, Dr. Michael D. Wolk ("Dr. Wolk") found that the percutaneous decompression surgery was not "reasonable and necessary" because, based upon his review of medical literature, this procedure "is still considered experimental."[1] On appeal, Workers' Compensation Judge Karen A. Wertheimer affirmed Dr. Wolk's decision.[2] There were no appeals to this portion of Judge Wertheimer's decision.

---

[1] ***See*** Exhibit P-12 to "Plaintiff's Answer to the *In Limine* Motion of Defendants to Preclude Evidence or Testimony on Grounds of 'Variance' in the Expert Testimony of Plaintiff with the Amended Complaint."

[2] ***See*** Exhibit A to "Defendants' Memorandum of Law in Response to Plaintiff's Motion to Preclude Defendants from Contesting the Final U.R.O. Determination."

On April 10, 2008, Berdecia-Cortes filed a complaint against Dr. Rogers and Main Line. In an Amended Complaint filed on February 18, 2009, Berdecia-Cortes alleged that the May 4, 2006 surgery performed by Dr. Rogers had "failed," that the surgery had not abated his pain and suffering, and that he "will continue to be required to undergo extensive medical treatment" including "reparative or corrective surgery." Amended Complaint, 2/18.2009, at ¶¶ 47-48. Berdecia-Cortes asserted two causes of action against Dr. Rogers, both sounding in a failure to obtain informed consent, the first pursuant to 40 P.S. § 1303.504 and the second in negligence. Berdecia-Cortes alleged that Dr. Rogers, to obtain informed consent, should have (1) informed him that Dr. Marcotte had advised in written reports that percutaneous decompression surgery was not advisable, (2) reviewed Dr. Marcotte's written reports with him, (3) referred him back to Dr. Marcotte (or to another surgeon) for a second opinion, or (4) advised him that the percutaneous decompression surgery was not an accepted or approved treatment for his condition and/or it was still considered experimental for his condition. *Id.* at ¶ 43. Berdecia-Cortes asserted a claim of corporate negligence against Main Line.

In a series of pre-trial rulings, the trial court dismissed the corporate negligence cause of action against Main Line. The trial court granted Dr. Rogers motion to preclude Berdecia-Cortes from offering any evidence that the percutaneous decompression surgery was experimental and denied

Berdecia-Cortes' motion to preclude Dr. Rogers from contesting the "experimental" finding in the workers' compensation proceedings. The trial court also precluded Dr. Wolk from testifying and prohibited Dr. Alexander Weingarten ("Dr. Weingarten"), Berdecia-Cortes' primary liability expert, from offering any opinions regarding informed consent. At the conclusion of trial, the jury rendered its verdict in favor of Dr. Rogers, and the trial court denied Berdecia-Cortes' post-trial motion for a new trial.

On appeal, Berdecia-Cortes seeks a new trial, raising five issues for our consideration and determination. Four of these issues involve challenges to the trial court's pre-trial rulings and the fifth questions an evidentiary ruling at trial. Our standard of review from a trial court's denial of a motion for a new trial is limited, as we will not reverse its decision absent a clear abuse of discretion or an error of law that controls the outcome of the case. *See, e.g.*, *Maya v. Johnson & Johnson*, 97 A.3d 1203, 1218 (Pa. Super. 2014). Our standard of review of a trial court's admission or exclusion of evidence is based upon the principle that the admission of evidence is a matter within the sound discretion of the trial court, and will not be reversed absent a showing that the trial court clearly abused its discretion. *See, e.g.*, *Commonwealth v. Akbar*, 91 A.3d 227, 235 (Pa. Super. 2014). A ruling on evidence may constitute reversible error only if it was harmful or prejudicial to the complaining party. *Polett v. Pub. Commc'ns, Inc.*, 83 A.3d 205, 218-19 (Pa. Super. 2013), *appeal granted*, 91 A.3d 1237 (Pa.

2014).  The admissibility of expert testimony is left to the discretion of the trial court, and the trial court's decision will not be overruled absent a clear abuse of discretion.  ***Hatwood v. Hospital of the University of Pennsylvania***, 55 A.3d 1229, 1239 (Pa. Super. 2012), *appeal denied*, 65 A.3d 414 (Pa. 2013).

We begin with consideration of Berdecia-Cortes' third issue on appeal, as we consider it to be dispositive.  Berdecia-Cortes contends that the trial court erred in refusing to permit Dr. Weingarten to testify regarding a physician's duty of obtaining informed consent in Pennsylvania.  During *voir dire* cross-examination, Dr. Weingarten indicated that his knowledge regarding Pennsylvania's informed consent statute (40 P.S. § 1303.504) came from various plaintiff's attorneys for whom he had testified (including counsel for Berdecia-Cortes).  N.T., 12/3/2012, at 35.  Based upon this testimony,[3] the trial court ruled that "Dr. Weingarten was unfamiliar with the Pennsylvania Informed Consent Statute," and thus did not qualify to offer expert testimony pursuant to Rule 702 of the Pennsylvania Rules of Civil Procedure because he did not possess "scientific, technical or other specialized knowledge beyond that possessed by a layperson which will

---

[3]  During *voir dire*, the trial court stated that "[w]e need to make a determination and see whether or not this doctor is qualified to be an expert witness in the issue of informed consent under the Pennsylvania Statute. ***Id.*** at 63.

assist the trier of fact to understand the evidence or to determine a fact in issue." Trial Court Opinion, 4/4/2014, at 4; N.T., 12/3/2012, at 75.

In a claim alleging lack of informed consent,

> it is the conduct of the unauthorized procedure that constitutes the tort. *Moure v. Raeuchle*, 529 Pa. 394, 604 A.2d 1003, 1008 (1992). A claim of a lack of informed consent sounds in the intentional tort of battery because an operation performed without the patient's consent is deemed to be the equivalent to a technical assault. *Smith v. Yohe*, 412 Pa. 94, 194 A.2d 167, 174 (1963). To obtain a patient's informed consent, doctors must provide patients with 'material information necessary to determine whether to proceed with the surgical or operative procedure or to remain in the present condition.' *Duttry v. Patterson*, 565 Pa. 130, 771 A.2d 1255, 1258 (2001) (quoting *Sinclair by Sinclair v. Block*, 534 Pa. 563, 633 A.2d 1137, 1140 (1993)). This information must give the patient 'a true understanding of the nature of the operation to be performed, the seriousness of it, the organs of the body involved, the disease or incapacity sought to be cured, and the possible results.' *Id.* (quoting *Gray v. Grunnagle*, 423 Pa. 144, 223 A.2d 663, 674 (1966)). While doctors are not required to disclose 'all known information,' they are required to 'advise the patient of those material facts, risks, complications and alternatives to surgery that a reasonable person in the patient's situation would consider significant in deciding whether to have the operation.' *Gouse v. Cassel*, 532 Pa. 197, 615 A.2d 331, 334 (1992) (emphasis omitted).

*Isaac v. Jameson Mem'l Hosp.*, 932 A.2d 924, 929 (Pa. Super. 2007) (quoting *Valles v. Albert Einstein Med. Ctr.*, 805 A.2d 1232, 1237 (Pa. 2002)).

Because a claim for lack of informed consent is a technical battery, Pennsylvania appellate courts have sometimes said that ordinary negligence principles do not apply. *See Montgomery v. Bazaz–Sehgal*, 798 A.2d 742, 749 (Pa. 2002). Where (as here), however, the tortious conduct alleged is the undertaking of surgery without obtaining informed consent, at its core, this action requires a showing that the physician "failed to conform to a specific acceptable professional standard." *Pollock v. Feinstein*, 917 A.2d 875, 878 (Pa. Super. 2007). For informed consent in Pennsylvania, this "specific acceptable professional standard" is the prudent patient standard, *Southard v. Temple Univ. Hosp.*, 781 A.2d 101, 106 (Pa. 2001), which is now codified at 40 P.S. § 1303.504:

> **(a) Duty of physicians.--**Except in emergencies, a physician owes a duty to a patient to obtain the informed consent of the patient or the patient's authorized representative prior to conducting the following procedures:
>
> > (1) Performing surgery, including the related administration of anesthesia.
> >
> > (2) Administering radiation or chemotherapy.
> >
> > (3) Administering a blood transfusion.
> >
> > (4) Inserting a surgical device or appliance.
> >
> > (5) Administering an experimental medication, using an experimental device or using an approved medication or device in an experimental manner.

**(b)** **Description** **of** **procedure.--**Consent is informed if the patient has been given a description of a procedure set forth in subsection (a) and the risks and alternatives that a reasonably prudent patient would require to make an informed decision as to that procedure. The physician shall be entitled to present evidence of the description of that procedure and those risks and alternatives that a physician acting in accordance with accepted medical standards of medical practice would provide.

**(c)** **Expert** **testimony.--**Expert testimony is required to determine whether the procedure constituted the type of procedure set forth in subsection (a) and to identify the risks of that procedure, the alternatives to that procedure and the risks of these alternatives.

**(d) Liability.--**

(1) A physician is liable for failure to obtain the informed consent only if the patient proves that receiving such information would have been a substantial factor in the patient's decision whether to undergo a procedure set forth in subsection (a).

(2) A physician may be held liable for failure to seek a patient's informed consent if the physician knowingly misrepresents to the patient his or her professional credentials, training or experience.

40 P.S. § 1303.504.

The certified record on appeal does not support the trial court's rulings with respect to Dr. Weingarten's lack of expertise regarding informed consent. Based upon his testimony during *voir dire* cross-examination that

his knowledge of Pennsylvania's informed consent statute (40 P.S. § 1303.504) came from plaintiffs' attorneys, counsel for Dr. Rogers argued that Dr. Weingarten was "merely parroting" what he had been told by others and that he had no competence on the issue. N.T., 12/3/2012, at 44-45. The trial court added that the "only way for me to qualify him as an expert and the only way for you to move him in as an expert is if he has specialized knowledge about informed consent in Pennsylvania." *Id.* at 47. The trial court then reopened *voir dire*, at which time Dr. Weingarten testified at length as follows:

> Q.    Dr. Weingarten, we want to hone in on your expertise with regard to the lack of informed consent. Over your career, have you been involved in such an issue in litigation matters or in treatment matters?
>
> A.    Well, I actually go through informed consent on a daily basis in my practice. Every procedure that we do in the office, as well as we even get informed consent when it comes to medication management.
>
>        You know, we talk – you know, it's a consent that talks about the risks, the benefits, the alternatives of whatever the issue is whether it's medication management, whether it's undergoing a procedure where we explain to the patient what the risks are of the medication, the procedure, what the benefits are, why we're recommending it and what the alternatives are because patients, if there are alternatives that make sense, need to be given those alternatives because the definition – one of the definitions of informed consent is that the consent has to be given to a patient where any patient in that particular circumstance would be expected to get this information – again, risks, benefits and

alternatives – so that they can under – at least analyze the data, if you want to call it that, against what [] the risks are, what the benefits are, what their options are, what their alternative are so they can make an educated decision about what is going to happen to them vis-à-vis a procedure, vis-à-vis taking certain medications in terms of allowing the patient to be in charge of their own fate.

Okay. That's what we're giving the patient. We're giving the patient what we believe is the facts. The good facts, the benefits; the bad facts, the possibility of what could go wrong and other facts in terms of what other available options there are so that everybody, you know, has all the information they need to analyze it and make a decision that's going to affect their body, their future, their family, whatever the issue is.

That's basically what informed consent does. It's a written document that says that we've explained these things to them. Again, risks, benefits and alternatives. In many cases we write out the risks, benefits and alternatives so that they can initial it, eventually sign it and it's witnessed so that there's a record that we have educated the patient to the best of our ability of what they're about to undergo, whether they want to undergo it, and whether there are other options that may be either safer or may be better that aren't being put on the table at that moment in time which they have the option of exploring.

So that in a nutshell is what informed consent is and, again, I do inform[ed] consent every single day that I have – that I run my practice because we always have procedures that we do every day.

And, again, in medical/legal issues, this issue of informed consent always comes up in litigation matters. Not every, you know, case that I do but, you know, fairly often and that's what we analyze, whether the patient was given the risks, the benefits

- 10 -

> and alternatives and enough data to allow an average patient that's in the same circumstance as whatever the case is to have been able to process the information in an informative way having been given all the data that they need to be given.

***Id.*** at 58-62.

Subsection 1303.514(b) provides that informed consent requires the physician to advise the patient of, *inter alia*, "the risks and alternatives that a reasonably prudent patient would require to make an informed decision as to that procedure," and subsection 1303.504(c) requires expert testimony on informed consent to establish "the risks of that procedure, the alternatives to that procedure and the risks of these alternatives." 40 P.S. § 1303.504(b)-(c). In the above-quoted testimony, Dr. Weingarten demonstrated a clear understanding of informed consent in Pennsylvania, including a physician's duty to provide the patient with the data necessary to understand the risks, benefits, and alternatives to a proposed procedure. Dr. Weingarten also established his experience in providing patients with such information on a regular basis and his understanding of the professional obligations of a physician to do so. His knowledge of the Pennsylvania statute (40 P.S. § 1303.504) was irrelevant in this context, as his expert testimony was focused on whether Dr. Rogers had failed to conform to a ***specific acceptable professional standard*** – namely to provide Berdecia-Cortes with the "material information necessary to determine whether to proceed with the surgical or operative procedure or to

remain in the present condition." ***See, e.g.***, ***Pollock***, 917 A.2d at 878. Dr. Weingarten established his competence to offer expert testimony by demonstrating his understanding of the applicable professional standard at issue and his experience in complying with said professional standard.

In accordance with subsection 1303.504(c), an expert witness may offer his or her opinion that a physician has failed to comply with the applicable professional standard for informed consent. In ***Bey v. Sacks***, 789 A.2d 232 (Pa. Super. 2001), for example, the appellant doctor (Dr. Sacks) argued that the trial court should not have permitted the appellant's expert to testify "as to whether he believed that Dr. Sacks adequately had presented the risks or alternative procedures to Mr. Bey before he elected to have [his] tooth extracted." ***Id.*** at 239. This Court disagreed, ruling that this inquiry was "within the realm of legitimate direct examination." ***Id.***

For these reasons, we must conclude that the trial court abused its discretion in refusing to permit Dr. Weingarten to testify regarding whether Dr. Rogers failed to comply with his professional obligations to obtain Berdecia-Cortes' informed consent prior to surgery in this case. We must likewise conclude that the trial court's error was prejudicial to Berdecia-Cortes and controlled the outcome of the case. Both of Berdecia-Cortes' causes of action against Dr. Rogers sounded in the alleged failure to obtain informed consent, and the trial court's ruling prohibited Berdecia-Cortes' liability expert witness from testifying on that specific issue. Moreover, the

trial court announced its ruling in the presence of the jury and repeated it thereafter in ruling on subsequent objections – clearly communicating to the jury that Dr. Weingarten was not qualified to offer an opinion on informed consent.[4]   Accordingly, we must reverse and remand the case for a new trial.

---

[4]  In announcing its decision, the trial court stated:

> THE COURT:  Okay.  I will accept him [Dr. Weingarten] as an expert on pain management issues.  I will not accept him – I will not qualify him as an expert witness in the area of informed consent in the State of Pennsylvania.

N.T., 12/3/2012, at 75.  In ruling on an objection from counsel for Dr. Rogers, the trial court indicated as follows:

> Q.    Doctor, I'm going to ask you to assume that the jury will be told by Mr. Berdecia and the jury may find that after the referral or the recommendation of Dr. Rogers on April 11[th], 2006 for percutaneous disc discectomy that Dr. Rogers never provided the plaintiff with copies of the reports of Dr. Marcotte that we have been referring to here today.
>
> Do you have a professional opinion [] whether Dr. Rogers failed to comply with accepted medical standards in failing to give that information to … Mr. Berdecia?
>
> [Counsel for Dr. Rogers]  Objection.  This part of his informed consent claim.
>
> THE COURT:  I'll strike the question.  It's not permissible.  He's not qualified as an expert in this area so he can't testify to that.

*Id.* at 85-86.

In anticipation of the new trial, we address certain other issues raised on appeal by Berdecia-Cortes. First, Berdecia-Cortes contends that the trial court erred in refusing to apply the doctrine of collateral estoppel to the decision of Workers' Compensation Judge Wertheimer. According to Berdecia-Cortes, if the trial court had properly applied collateral estoppel here, Dr. Rogers would have been "legally precluded … from contesting liability" because the decision in the workers' compensation proceedings established that the surgery "was experimental in nature and therefore was unreasonable as a matter of law." Berdecia-Cortes' Brief at 19-20.

We disagree. "Collateral estoppel, or issue preclusion, is a doctrine which prevents re-litigation of an issue in a later action, despite the fact that it is based on a cause of action different from the one previously litigated." **Balent v. City of Wilkes–Barre**, 669 A.2d 309, 313 (Pa. 1995).[5] Collateral estoppel applies only if five elements are established:

> (1) the issue decided in the prior case is identical to one presented in the later case;
>
> (2) there was a final judgment on the merits;
>
> (3) the party against whom the plea is asserted was a party or in privity with a party in the prior case;
>
> (4) the party or person privy to the party against whom the doctrine is asserted had a full and fair

---

[5] Application of collateral estoppel in a particular case is a question of law over which our review is plenary. **Cohen v. Workers' Compensation Appeal Board (City of Philadelphia)**, 909 A.2d 1261, 1265 (Pa. 2006).

> > opportunity to litigate the issue in the prior proceeding; and
>
> > (5) the determination in the prior proceeding was essential to the judgment.

**Weissberger v. Myers**, 90 A.3d 730, 733 (Pa. Super. 2014) (quoting **Catroppa v. Carlton**, 998 A.2d 643, 646 (Pa. Super. 2010)). This Court has held that principles of collateral estoppel apply to decisions in workers' compensation proceedings. **Capobianchi v. BIC Corp.**, 666 A.2d 344, 348 (Pa. Super. 1995).

The certified record on appeal reflects that Berdecia-Cortes has failed to establish at least two of these required elements. First, with respect to the third element, Dr. Rogers was not a party to the workers' compensation proceedings in question. The action was instituted by Berdecia-Cortes' employer (Delaware Valley), and the case caption reflects that the parties thereto were Berdecia-Cortes and Delaware Valley. **See** Defendants' Memorandum of Law in Response to Plaintiff's Motion to Preclude Defendants from Contesting the Final U.R.O. Determination, 11/30/2007, at Exhibit A ("Jose Berdecia-Cortes v. Delaware Valley Lift Truck, Inc."), While Dr. Rogers was a service provider for the charges at issue, Berdecia-Cortes has provided no authority for the proposition that a service provider is a party to a workers' compensation proceeding for collateral estoppel purposes.

In addition, we agree with the trial court that Dr. Rogers was not in privity with Delaware Valley.[6] The certified record provides no support for Berdecia-Cortes' contention that the workers' compensation decision "ended and deprived" Dr. Rogers of "any entitlement to be paid" for the surgery at issue in this case. Berdecia-Cortes' Brief at 32. The outcome of the workers' compensation proceedings only absolved Delaware Valley of responsibility for paying for the surgery, and did not preclude Dr. Rogers from seeking payment from another source (*e.g.*, from Berdecia-Cortes).

The fifth element of the test for collateral estoppel, that the determination in the prior proceeding was essential to the judgment, was also not satisfied here. In her decision, Judge Wertheimer concluded as follows:

> The undersigned has carefully and thoroughly reviewed the medical report of Michael D. Wolk, M.D. and finds his opinion credible and supported by medical literature, clinical studies, and Dr. Marcotte's report. Dr. Marcotte, a neurosurgeon, concluded that a simple decompressive surgery would not be of benefit to [Berdecia-Cortes]. Dr. Wolk mentioned that from his teleconference with Dr. Rogers, Dr. Rogers indicated that he had hoped Dr. Marcotte would perform the surgery, but he did not. As the consulting neurosurgeon declined to perform the surgery, there is significant merit to Dr. Wolk's opinion of the surgery not being reasonable and

---

[6] For purposes of collateral estoppel, privity requires "such an identification of interest of one person with another as to represent the same legal right." *Catroppa*, 998 A.2d at 647 (quoting *Ammon v. McCloskey*, 655 A.2d 549, 554 (Pa. Super. 1995)).

> necessary. Moreover, Dr. Wolk indicated that the procedure is still considered experimental.

Defendants' Memorandum of Law in Response to Plaintiff's Motion to Preclude Defendants from Contesting the Final U.R.O. Determination, 11/30/2007, Exhibit A at 15.

We cannot agree with Berdecia-Cortes' contention that Dr. Wolk's opinion that the percutaneous disc compression surgery was "experimental" was essential to the determination in the workers' compensation proceeding. The determination at issue in that proceeding was a coverage issue, specifically whether the surgery was "reasonable and necessary" to remedy a workplace injury such that Berdecia-Cortes' employer was responsible for its costs. As the above-quoted language from Judge Wertheimer's opinion makes clear, Dr. Wolk's opinion that the surgery was experimental was not essential to this determination, and was instead mentioned only briefly (essentially as an afterthought). In this regard, we note that neither Dr. Wolk, Judge Wertheimer, nor Berdecia-Cortes have referenced any authority for the proposition that an experimental surgery can never be considered "reasonable and necessary" in the workers' compensation context.

Next, Berdecia-Cortes claims that the trial court erred in refusing to permit Dr. Wolk to testify. Berdecia-Cortes listed Dr. Wolk as an expert witness in his pre-trial statement, and in response to Dr. Rogers' motion *in limine* to exclude Dr. Wolk's testimony, he indicated that Dr. Wolk's expert

testimony would focus on whether the surgery "utilizing the Stryker DeKompressor surgical device or tool was experimental… ."[7] Plaintiff's Answer to Defendants' Motion to Preclude Plaintiff from Presenting Michael Wolk, M.D. as an Expert Witness on Behalf of Plaintiff, 11/16/2012, at ¶ 8. The trial court granted the motion *in limine*, stating that "Dr. Wolk made absolutely no analysis or mention of whether the procedure, itself, was performed properly, or whether there was any malpractice on the part of Dr. Rogers." Trial Court Opinion, 4/4/2014, at 4.

In our view, the trial court erred in excluding Dr. Wolk as a possible expert witness at trial. Subsection 1303.504(a)(5) provides that a physician has a duty to obtain informed consent when "using an approved … device in an experimental manner," and subsection 1303.504(c) states that expert testimony "is required to determine whether the procedure constituted the type set forth in subsection (a)." 40 P.S. § 1303.504(a), (c). In his report, Dr. Wolk cites to authoritative literature and studies in support of his finding that "percutaneous lumbar disc decompression using the Dekompressor is … still considered experimental." Plaintiff's Answer to the *In Limine* Motion of Defendants to Preclude Evidence or Testimony on Grounds of 'Variance' in

---

[7] On appeal, Berdecia-Cortes also contends that Dr. Wolk should have been permitted to testify regarding his conversation with Dr. Rogers while performing his utilization review. Berdecia-Cortes' Brief at 42. The certified record does not reflect that Berdecia-Cortes ever offered Dr. Wolk as a fact witness or otherwise informed the trial court that he could testify as a fact witness regarding a conversation with Dr. Rogers. As such, the issue has not been preserved for appeal and we will not address it. Pa.R.A.P. 302(a).

the Expert Testimony of Plaintiff with the Amended Complaint, 11/4/2012, Exhibit P-12 at 3.

For these reasons, the trial court erred in precluding Berdecia-Cortes from offering Dr. Wolk as an expert witness at trial on the limited issue of whether the surgery performed by Dr. Wolk involved "using an approved … device in an experimental manner." Because Dr. Wolk's report includes no findings or opinions regarding informed consent or Dr. Rogers' disclosures (or lack thereof) to Berdecia-Cortes in this regard, he could not also testify that Dr. Rogers violated any duty under the informed consent statute. Such testimony would have to be provided by another expert witness.

Berdecia-Cortes next contends that the trial court erred in dismissing Main Line from the action. In his Amended Complaint, Berdecia-Cortes asserts a claim of corporate negligence against Main Line. To support a claim for corporate negligence against a hospital, unless the hospital's negligence is obvious, a plaintiff must produce expert testimony to establish that the hospital deviated from an accepted standard of care and that the deviation was a substantial factor in causing the harm to the plaintiff. *See, e.g.*, ***Welsh v. Bulger***, 698 A.2d 581, 585 (Pa. 1997). We agree with the trial court here that Berdecia-Cortes offered no expert testimony regarding Main Line's alleged corporate negligence. Most notably, the expert report of Dr. Weingarten includes no opinions regarding Main Line's activities in connection with the surgery performed at its facility by Dr. Rogers.

On appeal, Berdecia-Cortes argues that Main Line could be held responsible on a theory of *respondeat superior*. In the answer to Berdecia-Cortes's Amended Complaint, however, Dr. Rogers and Main Line denied that any agency relationship existed between them, and Berdecia-Cortes has not directed us to any evidence in the certified record to establish that an employment relationship existed.

Alternatively, Berdecia-Cortes contends that even if the relationship between the hospital and physician was of the independent contractor variety, Main Line can nevertheless be held liable on a theory of "ostensible agency," pursuant to which a hospital can be liable if it "holds out" the physician as its employee. **Parker v. Freilich**, 803 A.2d 738, 747 (Pa. Super. 2002) (quoting **Capan v. Divine Providence Hospital**, 430 A.2d 647, 649 (Pa. Super. 1980)). A "holding out occurs when the hospital acts or omits to act in some way which leads the patient to a reasonable belief he is being treated by the hospital or one of its employees." **Id.** Again, however, Berdecia-Cortes has not directed this Court to any evidence in the certified record to demonstrate that he satisfied these evidentiary requirements. As a result, no basis exists for us to conclude that the trial court erred in dismissing Main Line.

Judgment reversed. Case remanded for a new trial. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/27/2014